## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALAN J. SCHNEIDER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Case No. 16-cv-2843** |
| | ) | |
| DONALDSON FUNERAL HOME, P.A. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| DONALDSON PROPERTIES NO 3 LLC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DEWITT JAY DONALDSON | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HOWARD COUNTY, MARYLAND | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Alan J. Schneider ("Schneider" or "Plaintiff") and alleges as follows:

### INTRODUCTION

1.     Plaintiff brings this complaint for declaratory and injunctive relief and the imposition of civil penalties under the Federal Water Pollution Control Act, more commonly referred to as the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1251 *et seq*.

2.      Plaintiff brings this citizen suit under § 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), against Defendants Jay Donaldson, Donaldson Properties No 3, LLC and Donaldson Funeral Home, P.A. (collectively, "Donaldson"), for past and continuing violations of the Act.

3.      Plaintiff brings this citizen suit under § 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), against Defendant Howard County, Maryland (the "County"), for failure to comply with or otherwise acting in violation of orders and regulations issued by the Administrator of the Environmental Protection Agency ("EPA") and/or the State of Maryland ("State") through the Maryland Department of the Environment ("MDE") with respect to certain effluent standards or limitations under the Act.

4.      Schneider institutes this action to protect, restore, and otherwise maintain the integrity of a high quality waterway (the "Tributary") which borders his residential property.

5.      On July 3, 2013, the County, by and through its Board of Appeals ("Board"), ruled in favor of granting Donaldson a conditional use to construct a large new complex mortuary of 17,000 sq. ft. (the "Mortuary") on the basis of incomplete, false, or misleading information; construction of which will have (and is having) direct, proximate, and foreseeable negative impacts on the chemical, physical, and biological integrity of the Tributary.

6.      On March 26, 2016, Donaldson commenced construction, or caused construction to be commenced on its behalf, that will disturb more than one (1) acre, but less than five (5) acres of land, prior to applying for or receiving coverage under an individual National Pollution Discharge Elimination System ("NPDES") permit for such activity, or under Maryland's approved General Permit for Stormwater Associated with Construction Activity.

7.      By letter dated April 5, 2016, Schneider provided all Defendants with Notice of Intent to Sue under the Clean Water Act. Ex. 1, Schneider NOI.

8.      Upon information and belief, Defendant Donaldson neither sought nor received the required CWA permits for any of his discharges or fill activities described above until after construction had commenced.

9.      Upon information and belief, Donaldson has neither sought nor received the requisite permits from the Corps for its current and proposed activity in and proximate to jurisdictional wetlands and one of the headwater streams of Carrolls Branch I (*i.e.*, the Tributary).

10.     The Tributary is part of one of the last high-quality water bodies left in Howard County; MDE has identified only six such sub-watersheds in the entire County. *See, e.g.*, Ex. 2, Howard County Tier II Waters Map (2010), (*map available online at* http://www.mde.state.md.us/assets/document/hb1141/howard/Howard_County.pdf  (last accessed August 2, 2016)). Moreover, the Tributary is part of the Patuxent River watershed, and therefore subject to the prohibitions contained in MD Code, Environment § 4-307 ("A person may not discharge raw sewage *or any other waste* into the Patuxent River… *or any of [its] tributaries*.") (emphasis added).

11.     Despite the well-researched, meaningful input of Schneider and others into the relevant proceedings, the County has nevertheless ignored, dismissed, or failed to take action to prevent the environmental harms to the Tributary and associated wetlands, which construction and operation of the Mortuary will cause.

12.     Defendants' ongoing, continuous violations of the CWA have caused and, absent abatement and restoration, will continue to cause significant damage to the ecosystems of the Tributary, and points downstream.

13.     Specifically, Defendants' actions have already caused or contributed to the loss or degradation of habitat of birds, fish, and other wildlife; diminution of wildlife biodiversity; severely impacted the aesthetic values associated with; and impaired fishing and other recreational uses of the area by significantly impacting water quality and degrading the aquatic habitat values for the Tributary.

14.     In addition, Defendants' actions have resulted in, *inter alia*, dredged spoil, solid waste, biological materials, heat, rock, sand, cellar dirt and/or industrial, municipal, and agricultural waste being discharged into the jurisdictional waters of the United States (and specifically to the tributaries of the Patuxent River), without a permit to do so.

15.     Similarly, neither Donaldson nor the County has conducted the antidegradation review, nor have the Defendants presented or evaluated the social and economic justification required prior to authorizing any discharge into a Tier II Waterbody. *See*, *e.g.*, 40 C.F.R. § 131.12.

16.     Donaldson's discharge is therefore wholly unlawful under the Act, and the County has failed to uphold its responsibilities thereunder.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a). The relief requested is proper under 28 U.S.C. §§ 2201 and 2202, and 33 U.S.C. §§ 1319(d) and 1365(a).

18.     This Court has personal jurisdiction over all the parties to this action, as all Defendants are Maryland corporations or instrumentalities of the State.

19.     Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff Schneider notified Defendants of Defendants' violations of the CWA and of Plaintiff's intent to bring suit under the CWA by letter postmarked April 6, 2016. A true and correct copy of the Notice Letter and the exhibits thereto is attached to this Complaint as Exhibit 1 (the "NOI"). Schneider notified the Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator for EPA Region 3; and the Secretary of the Maryland Department of the Environment ("MDE"). The notifications for the EPA officials and MDE were postmarked April 6, 2016. Ex. 3, NOI Mailing & Delivery Receipts. The NOIs were delivered, variously, between April 7, 2016 and April 11, 2016. *Id.*

20.     The violations complained of herein all occurred and continue occurring within Howard County. Consequently, venue in this Court is proper pursuant to 33 U.S.C. § 1365(c)(1).

## PARTIES

21.     Defendant Howard County is a Maryland county, which has adopted charter home rule under Article XI-A of the Maryland Constitution. Pursuant to section 9-201 of the Local Government Article, Maryland Code annotated, the County may sue and be sued.  MD Code, Local Government, § 9-201(2).

22.     Defendant Donaldson Properties No 3, LLC is a Maryland limited liability corporation with its principal office at 313 Talbott Ave., Laurel, MD 20707, and with a State Department of Assessments and Taxation ("SDAT") identification number of W13263272.

23.     Defendant Donaldson Funeral Home, P.A. is a Maryland Professional Association, also having its principal office at 313 Talbott Ave., Laurel, MD 20707.  It is registered with SDAT under Department ID D02025427.

24.     Defendant DeWitt "Jay" Donaldson is a Maryland citizen identified as the owner of the Mortuary on one of the permits granted by the County. Ex. 4, County Permits, at 5. The website for Donaldson Funeral Home, P.A. identifies him as the owner thereof. *See* http:// http://www.donaldsonlaurel.com/ (last accessed June 19, 2016); *see also* http://www.funeralhomehosting.com/dnc (website for the Mortuary; last accessed June 19, 2016).

25.     Plaintiff Schneider is a Maryland citizen, who resides at 12598 Clarksville Pike, Clarksville, MD 21029-1534.

26.     Plaintiff uses and enjoys, and has used and enjoyed, the waters that are being or will be affected directly by Defendants' activities described above. Plaintiff intends to continue to use these same waters in the future and has specific and near-term plans to return to use such waters for the uses described above throughout 2016 and beyond. Ex. 5, Schneider Declaration.

### STATUTORY BACKGROUND

27.     Congress enacted the Clean Water Act in 1972 with the stated goal of restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The aspirational goal of the CWA was that "the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1).

28.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), declares that "the discharge of any pollutant by any person shall be unlawful," unless in compliance with a permit issued pursuant to Section 402 or 404, 33 U.S.C. §§ 1342 or 1344.

29.     The Act defines "pollutant" as "*dredged spoil*, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, *biological materials*, radioactive materials, heat, wrecked or discarded equipment, *rock, sand, cellar dirt* and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6) (emphasis added).

30.     The Act further defines "discharge of a pollutant" to mean, in relevant part, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

31.     A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

32.     For purposes of the Clean Water Act, the EPA has, by regulation, defined "new sources" of pollution as generally being "any building, structure, facility or installation from which there is or may be the discharge of pollutants." 40 C.F.R. § 401.11(e).

33.     As regards construction and development, a "new source" is "any source… that commences construction activity after" December 1, 2009. 40 C.F.R. § 450.11(a); 74 FR 63057.

34.     By regulation, the EPA has determined that construction of a new source of discharges has "commenced" for purposes of NPDES permit requirements if the owner or operator of such source has:

"(i) Begun, or caused to begin as part of a continuous on-site construction program:
    (A) Any placement, assembly, or installation of facilities or equipment; or
    (B) Significant site preparation work including clearing, excavation or removal of existing buildings, structures, or facilities which is necessary for the placement, assembly, or installation of new source facilities or equipment; or
(ii) Entered into a binding contractual obligation for the purchase of facilities or equipment which are intended to be used in its operation with a reasonable time."

40 C.F.R. § 122.29

35.     Section 404(a) of the Act, 33 U.S.C. § 1344(a), allows the Secretary of the Army, via the Corps, to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

36.     Section 404 of the Act further provides that, subject to the restrictions imposed by the Corps, a State shall not be denied or precluded from controlling "the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State." 33 U.S.C. § 1344(t).

37.     The State of Maryland has, by law, established an independent program regulating the discharge of dredged or fill material to its jurisdictional waters. MD Code, Environment, §§ 5-901, *et seq.*; 16-101, *et seq.*

38.     In addition, the State of Maryland has specifically and explicitly prohibited the discharge of "raw sewage *or any other waste* into the Patuxent River, the Severn River, *or any of their tributaries.*" MD Code, Environment, § 4-307 (emphasis added).

39.     Section 402 of the CWA, 33 U.S.C. § 1342, establishes the National Pollutant Discharge Elimination System ("NPDES"), and grants the EPA authority to permit discharges of pollutants under certain circumstances. The EPA has delegated this authority to the State of Maryland, which in turn has designated MDE as the "State water pollution control agency." 33 U.S.C. § 1362(1).

40.     By regulation, the EPA requires a NPDES permit for "[c]onstruction activities including clearing, grading, and excavating that result in land disturbance of equal to or greater than one acre and less than five acres." 40 C.F.R. § 126.26(b)(15)(i).

41.     When granting a NPDES permit, the issuing agency must take into account the

water quality standards for the designated uses of the receiving water body. *See* 40 C.F.R.

131.21(d) ("Applicable water quality standards for purposes of the Act are the minimum

standards which must be used when the CWA and regulations implementing the CWA refer to

water quality standards, for example, in identifying impaired waters and calculating TMDLs

under section 303(d), developing NPDES permit limitations under section 301(b)(1)(C),

evaluating proposed discharges of dredged or fill material under section 404, and in issuing

certifications under section 401 of the Act.")

42.     Similarly, in order to receive delegated authority from EPA, a State water

pollution control agency must implement an antidegradation policy for its waters. 40 C.F.R. §

131.12. This antidegradation policy must, *inter alia*, "be consistent with the following:

> (1)     Existing instream water uses and the level of water quality necessary to
> protect the existing uses shall be maintained and protected.
> (2)     Where the quality of the waters exceed levels necessary to support
> propagation of fish, shellfish, and wildlife and recreation in and on the water, *that
> quality shall be maintained and protected*…"

40 C.F.R. §§ 131.12(a)(1)-(2) (emphasis added).

43.     Maryland has implemented such a policy, codified at Code of Maryland

Regulations ("COMAR") 26.08.02.04.

44.     As regards Tier II Waters, MDE provides, in pertinent part:

> "Certain waters of this State possess an existing quality that is better than the
> water quality standards established for them. *The quality of these waters shall be
> maintained* unless:
>> (1) The Department determines a change in quality is justifiable as a result
>> of necessary economic or social development; *and*
>> (2) The change will not diminish uses made of, or presently existing, in
>> these waters."

COMAR 26.08.02.04B (emphasis added).

45.     The CWA allows a citizen to commence a civil action "against any person … who is alleged to be in violation of [] an effluent standard or limitation" thereunder. 33 U.S.C. § 1365(a)(1)(A). The term "effluent standard or limitation" includes, *inter alia*, "an unlawful act" under Section 301(a) of the Act, or a violation of an "effluent limitation or other limitation" under Section 301 or 302 of the Act. 33 U.S.C. §§ 1365(f)(1)-(2).

46.     The citizen-suit provision, 33 U.S.C. § 1365, grants jurisdiction to the district courts of the United States to "enforce such an effluent standard or limitation," 33 U.S.C. § 1365(a), issue injunctions requiring compliance with the Act, *id*., assess civil penalties in accordance with 33 U.S.C. 1319(d), and award "costs of litigation (including reasonable attorney and expert witness fees)" to citizen plaintiffs. 33 U.S.C. § 1365(d).

## FACTUAL ALLEGATIONS

47.     Donaldson first proposed the construction of a large new complex mortuary of 17,000 sq. ft. (*i.e.*, the Mortuary) on a parcel having less than 3 buildable acres in southwest Howard County on State Route 108, more commonly called Clarksville Pike, on January 7, 2010.

48.     Schneider, along with many other local residents, have opposed Donaldson's proposed Mortuary since first learning of it.

49.     The address for the Mortuary is 12540 Clarksville Pike, Clarksville, MD 21029 (the "Property"), which is a rural, residential property on well and septic.

50.     Schneider resides at 12598 Clarksville Pike, Clarksville, MD 21029-1534, close to the Property; his property is bordered by the Tributary, downstream of the Property.

51.     The Tributary originates just north of the Property, and flows south-south-west until it joins with Carrolls Branch I (HUC-12 #021331060960), west of Clarksville Pike.  The

Tributary intersects the Property on its northwestern corner, and flows roughly parallel to the rear property line afterwards.

52.     MDE has designated Carrolls Branch I, and its tributaries as Tier II state waters, meaning that they exceed the minimum criteria for their designated use. *See* COMAR 26.08.02.04-1C (Compilation and Maintenance of the List of High Quality Waters); COMAR 26.08.02.04-1O (List of Tier II Waters); *see also* Ex. 2, Howard County Tier II Waters Map.

53.     Specifically, Carrolls Branch I is a Class IV-P stream, meaning its designated use is for Recreational Trout Waters and Public Water Supplies. *See* COMAR 26.08.02.03-3G.

54.     Tier II Waterbodies, such as the Tributary, are entitled to additional protection under Maryland's EPA-required antidegradation policy, and require additional scrutiny before a discharge thereto may be authorized. 40 C.F.R. § 131.12; COMAR 26.08.02.04 & 26.08.02.04-1.

55.     However, MDE has determined that the Tributary does not have any remaining assimilative capacity. Ex. 6, MDE Tier II High Quality Waters Map, *available online at* http://www.mde.maryland.gov/programs/Water/TMDL/Water%20Quality%20Standards/Pages/HighQualityWatersMap.aspx (last accessed August 2, 2016).

56.     Notwithstanding the fact that the Tributary has no assimilative capacity remaining, Mr. Schneider derives significant recreational and aesthetic value from the proximity to his home of such a high-quality waterway.

57.     Carrolls Branch I is itself a tributary of the Middle Patuxent River, which is in turn a tributary of the Patuxent River.

58.     Pursuant to one of the requirements of its Municipal Separate Storm Sewer System Permit ("MS4 Permit") Howard County received its most recent annual watershed quality assessment of the Middle Patuxent River Watershed (the "2015 Assessment") in

November of 2015. Ex. 7, 2015 Assessment Executive Summary; *available in full at*

https://www.howardcountymd.gov/LinkClick.aspx?fileticket=PO5dWmgWwWw%3d&portalid

=0 (last accessed August 11, 2016).

59.     The 2015 Assessment found, among other facts, that roughly nine and nine-

tenths' percent (9.9%) of the Middle Patuxent River Watershed's fifty-eight square miles (58 sq.

mi.) consists of impervious cover. Ex. 7, at 2.

60.     At ten percent (10%) impervious cover or higher, stream quality is considered

"impacted" by the effects of urbanization. Assessment at 24, § 2.2 (describing effects of

stormwater runoff on stream systems and habitats).

61.     On July 3, 2013, The County, by and through its Board of Appeals ("Board"),

ruled in favor of granting Donaldson a conditional use as depicted in the plan submitted to the

Board by Donaldson on August 15, 2012 ("Approved Plan").  *See* Ex. 8, Board Order; Ex. 9,

Approved Plan.

62.     Specifically, the Board Order held that: "[t]he conditional use shall apply *only* to

the proposed funeral home and mortuary as described in the petition and *as depicted* on the

Amended Conditional Use Plan dated August 15, 2012 and *not* to any other activities, uses or

structures on the Property." Ex. 8, Board Order at 2 (emphasis added); Howard County Board of

Appeals, BA Case No. 10-001C, at 31, *available in full at*

http://cc.howardcountymd.gov/LinkClick.aspx?fileticket=MBXGfojqfxA%3d&portalid=0 (last

accessed August 2, 2016).

63.     Although the Approved Plan did not identify any wetlands on the Property, MDE

subsequently visited the site in August of 2015 and confirmed that jurisdictional wetlands were

present. *See* Ex. 10, DPZ Project Management Communication – August 4, 2015; Ex. 11, ESA
Letter – October 21, 2015.

64. Schneider and his fellow concerned citizens hired Mr. Ron Wildman, a Registered
Environmental Manager, to assess the Property independently. Mr. Wildman's report is attached
hereto as Exhibit 12, along with photographs taken of the Property from the perimeter. Ex. 12,
ForEnviCon Assessment and Property Photos

65. However, in presenting its case to the Board, Donaldson submitted sworn expert
testimony which explicitly stated that no such wetlands were present on the Property. *See* Ex. 13,
ESA Forest Stand Delineation Cover Letter – August 27, 2013; Ex. 14, Burchick Testimony, at
1, 12 (Sworn Testimony of Mark Burchick stating that no wetlands were present on the
Property).

66. In addition, Donaldson did not submit, and the Board's Order entirely failed to
consider, the Social and Economic Justification ("SEJ") required prior to allowing any discharge
to a Tier II Waterway. *See* Ex. 15, Board Minority Opinion, at 6 (stating that "the Board
abdicated responsibility to properly consider the environmental factors regarding the Tier II
stream watershed in accordance with" State and County laws, regulations, and ordinances); *see
also* COMAR 26.08.02.04B, 26.08.02.04-1 ("Antidegradation Policy Implementation
Procedures"), 26.08.02.04-1G ("Tier II Antidegradation Review"), COMAR 26.08.02.04-1K &
.04-1L (setting forth SEJ factors for consideration).

67. As a result of MDE's exposure of the material omissions and misstatements
within Donaldson's sworn expert testimony, in October 2015, Donaldson revised its Site Plan to
include previously undisclosed wetlands and springs, for resubmission to the County's

Department of Planning and Zoning ("DPZ") for "technical approval." *See*, *e.g.*, Ex. 11, ESA Letter – October 21, 2015.

68.　　Despite the material revisions to Donaldson's Site Plan, the Board did not consider it again; the County (through DPZ) issued a "Commercial New Building Permit" to Donaldson on April 4, 2016.  Ex. 4, County Permits, at 7-8.

69.　　Upon information and belief, Donaldson's Commercial Grading Permit approval has not been reviewed or updated since its initial issuance on August 3, 2013. *Id.*, at 3-4.

70.　　On November 9, 2015, Schneider, along with other concerned citizens, met with County Executive Alan Kittleman ("Kittleman") and officials from DPZ to discuss the need to protect the Tributary and the County's environmental obligations. Ex. 5, Schneider Declaration.

71.　　At this meeting, the County was expressly informed that it was required, under the Clean Water Act, to conduct an antidegradation review, prior to allowing or approving any discharge to a Tier II stream. *Id*. at 5.

72.　　As of January 1, 2015, MDE's approved General Permit for Stormwater Associated with Construction Activity ("GCP"), consistent with EPA Regulations, requires any individual or entity that plans to disturb more than an acre of land to apply for coverage thereunder. Ex. 16, GCP; *see also* 40 C.F.R. § 126.26(b)(15)(i).

73.　　DPZ and Kittleman were informed of this requirement at the November 9 meeting, as well. Ex. 5, Schneider Declaration, at 5.

74.　　Notwithstanding the discussions of November 9, 2015, no later than March 26, 2016, Donaldson commenced construction, moving heavy equipment onto, clearing vegetation from, and grading the Property. *See* 40 C.F.R. § 122.29.

75.      Donaldson's contractor, Donald Souder, applied for coverage under the GCP no earlier than April 4, 2016, the day it received a Commercial New Building Permit from the County. Ex. 17, Donaldson GCP Application (MDE Reference Number MDRCN02DE); Ex. 4, County Permits, at 7-8.

76.      Donaldson's GCP Application included, as part of its supporting documentation, an approval from the Howard County Soil Conservation District dated July 14, 2014 – well over a year before Donaldson admitted the presence of jurisdictional wetlands on the Property, or included such wetlands on its Site Plan.

77.      Donaldson's GCP Application did not include the no-discharge alternative analysis, or the SEJ, required in order to satisfy the Tier II Antidegradation Review requirements of Maryland's implementation of the Clean Water Act. COMAR 26.08.02.04-1G; *see also* Ex. 17.

78.      On April 6, 2016, Schneider sent a Notice of Intent to Sue under Section 505 of the Clean Water Act, and which is incorporated herein by reference, to the County and to the Registered Agent for Donaldson Properties No 3, LLC and Donaldson Funeral Home, P.A. Ex. 1, NOI.

79.      Schneider also sent copies to the Administrator of the EPA, the Maryland Secretary of the Environment, and the Regional Administrator for EPA Region 3. Ex. 3, NOI Mailing & Delivery Receipts.

80.      Defendants received copies of the NOI on April 7, 2016 (County) and April 8, 2016 (Donaldson). MDE received its copy on April 7 (MDE), and both EPA and EPA Region 3 received copies on April 11, 2016. *Id.*

81. The mandatory sixty (60) day waiting period prior to filing suit following the NOI, 33 U.S.C. § 1365(b)(1)(A), elapsed no later than June 10, 2016.

82. Upon information and belief, Donaldson does not, in fact, have coverage under the GCP.

83. Nevertheless, Donaldson has continued and is continuing to move forward with construction on the Property.

84. At all times material to this Complaint, Donaldson has actively and affirmatively resisted any attempts by Schneider and other concerned citizens to have the Property fully evaluated by their own environmental experts.

## COUNT I – VIOLATION OF THE CLEAN WATER ACT

**Donaldson's Discharge of Pollutants without an Authorizing Permit under Section 402**

85. Plaintiff Schneider hereby repeats, re-alleges, and incorporates by reference paragraphs 1-84 and all exhibits thereto as if fully set forth in full herein.

86. Donaldson, through its contractor Donald Souder, commenced construction on the Mortuary no later than March 26, 2016, placing machinery, grading, and clearing vegetation on the Property.

87. Donaldson did not apply for coverage under the GCP until April 4, 2016, at the earliest.

88. Upon information and belief, Donaldson does not currently have coverage under the GCP.

89. Construction sites are a point source for purposes of Section 301 and 402 of the Act.

90.     Under the definitions contained within and pursuant to the CWA, Donaldson is therefore a "person," 33 U.S.C. § 1362(5), who has "discharged," 33 U.S.C. § 1362(16), "pollutants," 33 U.S.C. § 1362(6), from a "point source," 33 U.S.C. § 1362(14), into the "waters of the United States," 40 C.F.R. § 230.3(s); 33 C.F.R. § 328.3(a).

91.     Defendant Donaldson's violations have been continuously occurring since at least March 26, 2016, and continue to occur through the date of this Complaint.

92.     In the alternative, each day that the unauthorized biological material, rock, sand, or dirt or other waste attributable to Donaldson's activities has been present in the Tributary or any point downstream, or in jurisdictional wetlands, constitutes a separate and distinct violation of the CWA.

93.     There is a reasonable likelihood that the violations will continue to occur in the future, absent a favorable verdict from this Court.

94.     Schneider will suffer irreparable harm absent a preliminary injunction pending resolution of these proceedings. *See Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.")

95.     All conditions precedent to the filing of this suit have occurred or have been performed.

### COUNT II – VIOLATION OF THE CLEAN WATER ACT

**Donaldson's Discharge of Dredge or Fill Material to Jurisdictional Waters without an Authorizing Permit under Section 404**

96. Plaintiff Schneider hereby repeats, re-alleges, and incorporates by reference paragraphs 1-95 and all exhibits thereto as if fully set forth in full herein.

97. Donaldson, through its contractor Donald Souder, commenced construction on the Mortuary in and/or proximate to jurisdictional waters, wetlands or protective buffers thereof, no later than March 26, 2016, placing machinery, grading, and clearing vegetation on the Property.

98. Upon information and belief, Donaldson has not applied for or obtained coverage under a Section 404 permit from the Corps of Engineers for its discharges of dredged and/or fill material to jurisdictional wetlands.

99. Similarly, upon information and belief, Donaldson has not applied for or obtained a permit from MDE for its activities within or proximate to the buffer zone of nontidal wetlands of the State.

100. Under the definitions contained within and pursuant to the CWA, Donaldson is therefore a "person," 33 U.S.C. § 1362(5), who has "discharged," 33 U.S.C. § 1362(16), "pollutants," 33 U.S.C. § 1362(6), from a "point source," 33 U.S.C. § 1362(14), into the "waters of the United States," 40 C.F.R. § 230.3(s); 33 C.F.R. § 328.3(a).

101. Defendant Donaldson's violations have been continuously occurring since at least March 26, 2016, and continue to occur through the date of this Complaint.

102. In the alternative, each day that the unauthorized dredged spoil, biological material, rock, sand, or dirt or other fill material attributable to Donaldson's activities has been present in the Tributary or any point downstream, or in jurisdictional wetlands, constitutes a separate and distinct violation of the CWA.

103. There is a reasonable likelihood that the violations will continue to occur in the future, absent a favorable verdict from this Court.

104.     Schneider will suffer irreparable harm absent a preliminary injunction pending resolution of these proceedings. *See Amoco Prod. Co. v. Gambell*, 480 U.S. at 545.

105.     All conditions precedent to the filing of this suit have occurred or have been performed.

## COUNT III – VIOLATION OF THE CLEAN WATER ACT

### Donaldson's Failure to Conduct an Antidegradation Review

106.     Plaintiff Schneider hereby repeats, re-alleges, and incorporates by reference paragraphs 1-105 and all exhibits thereto as if fully set forth in full herein.

107.     The Tributary has been designated as a Tier II waterway.

108.     Prior to discharging to such a waterway, Donaldson was required to submit an SEJ to the County and to MDE, which was to have included analysis of a no-discharge alternative.

109.     Upon information and belief, Donaldson has neither conducted nor submitted an SEJ analysis to the County or to MDE.

110.     Failure to submit an SEJ prior to applying for a permit to discharge to Tier II waters is a violation of COMAR 26.08.02.04-1, which is in turn a violation of "an effluent standard or limitation … or order issued by [the] State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

111.     Failure to submit the SEJ or otherwise conduct the antidegradation review prior to *commencing* such a discharge renders any purported permit for such discharge null, void, or otherwise without effect or authority.

112.     Donaldson's failure may reasonably be remedied by a favorable verdict from this Court.

113.    Schneider has no other adequate remedy at law.

114.    Schneider will suffer irreparable harm absent a preliminary injunction pending resolution of these proceedings. *See Amoco Prod. Co. v. Gambell*, 480 U.S. at 545.

115.    All conditions precedent to the filing of this suit have occurred or have been performed.

## COUNT IV – VIOLATION OF THE CLEAN WATER ACT

### Howard County's Failure to Conduct an Antidegradation Review

116.    Plaintiff Schneider hereby repeats, re-alleges, and incorporates by reference paragraphs 1-115 and all exhibits thereto as if fully set forth in full herein.

117.    The Tributary has been designated as a Tier II waterway.

118.    Schneider had expressly informed the County of its obligation to conduct an antidegradation review prior to permitting or otherwise allowing any discharge to the Tributary.

119.    On April 4, 2016, the County granted Donaldson a Commercial New Building Permit for the Mortuary.

120.    Upon information and belief, the County had not conducted the required antidegradation review prior to issuing the April 4, 2016, Commercial New Building Permit.

121.    Failure to conduct the antidegradation review prior to allowing a discharge to Tier II waters is a violation of COMAR 26.08.02.04-1, which is in turn a violation of "an effluent standard or limitation … or order issued by [the] State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

122.    Upon information and belief, this failure is part of a pattern or practice, on the part of the County, of conducting inadequate environmental reviews prior to issuing approvals for development projects.

123.    Upon information and belief, the County will continue this pattern or practice of unlawful inadequacy, absent redress by a favorable verdict from this Court.

124.    Schneider has no other adequate remedy at law.

125.    Schneider will suffer irreparable harm absent a preliminary injunction pending resolution of these proceedings. *See Amoco Prod. Co. v. Gambell*, 480 U.S. at 545.

126.    All conditions precedent to the filing of this suit have occurred or have been performed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Schneider prays the Court for relief and judgment as follows:

A.  Issue a temporary restraining order against construction of the Mortuary, pending resolution of these proceedings;

B.  Declare that Defendants have violated and continue to violate the Clean Water Act;

C.  Enjoin the Defendants from violating the Act, whether through action or inaction;

D.  Order Defendants to remediate the harms caused by their Clean Water Act violations, to the maximum extent possible;

E.  Order Defendants to pay civil penalties in an appropriate amount, as provided by Sections 309(d) and 505(a) of the CWA, 33 U.S.C. § 1319(d), and 1365(a), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. Part 19, for each violation of the Clean Water Act occurring

1.  On or after March 26, 2016, in the case of Defendant Donaldson; and

2.  On or after April 4, 2016 in the case of Defendant County;

21

F.  Retain jurisdiction over this matter until such time as Defendants have come into compliance with the requirements of the Act and fully complied with every order of this Court;

G.  Award to Plaintiff his litigation expenses, including reasonable attorney fees, costs, and expert witness fees, as authorized by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

H.  Award such other relief as this Court deems appropriate.

Respectfully submitted,


Date:   August 12, 2016

_/s/Alexander J. E. English_

Alexander J. E. English, Esq.
U.S. Dist. Ct. for MD Bar ID #: 19568
GREENSPRING LEGAL, LLC
9980 Guilford Rd., No. 102
Jessup, MD 20794
*Phone*: 301.466.4024
*Fax*:    410.928.4952
*Email*: aenglish@greenspringlegal.com

*Attorney for Plaintiff*